1:25 MJ 4025

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Adam W. Anderson, a Task Force Officer with the Drug Enforcement Administration ("DEA"), United States Department of Justice, being first duly sworn, depose and state underoath as follows:

1.      This affidavit is made in support of a criminal complaint against Austin SIEBERT (hereinafter "SIEBERT"), charging that on or about November 27, 2024, SIEBERT violated Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), in that he knowingly knowingly distributed a schedule I controlled substance.

## TRAINING AND EXPERIENCE

2.      I am a State Trooper with approximately eighteen years of law enforcement experience and have been employed by Ohio State Highway Patrol (OSP) since April 2017. I am currently assigned as a Task Force Officer (TFO) to the Drug Enforcement Administration (DEA) Cleveland Office and have been so assigned since November 2020. I was employed by the City of Wooster Police Department, Wayne County, Ohio, prior to being employed as a State Trooper. I have a Master of Science degree in Criminal Justice Administration and Management. I have received specialized training at the Ohio State Highway Patrol Trooper Academy, the Medina County Law Enforcement Training Academy, and the Ohio Peace Officer Training Academy (OPOTA). I am currently certified as a State Trooper and am an OPOTA Certified State of Ohio Instructor and have been so since 2014. I have received training regarding the identification of controlled substances and the operation of drug trafficking individuals and organizations. I have further received training in the identification, organization and various ways drug trafficking organization's structure and mask their operations.

3.      I have been involved in investigating numerous individuals involved in the manufacturing, distribution, and use of controlled substances in both the United States and

Foreign Countries. I have successfully conducted investigations that have resulted in drug traffickers' arrests and the seizure of significant quantities of drugs, money, and weapons both in the United States and foreign countries. I have surveilled drug traffickers' operations and have interviewed numerous persons personally involved in the sale, transport, and use of narcotics. Through this training and experience, I have become familiar with and have gained a thorough understanding of the methods, manner, and means used by individuals engaged in the unlawful manufacturing, trafficking, transportation, and use of controlled substances.

4.      I have gained knowledge that members and co-conspirators of complex drug trafficking organizations utilize various veiling methods and engage in activities in efforts to thwart the efforts of law enforcement personnel. In particular members of drug trafficking organizations commonly utilize multiple cellular phones and subscribe said phone numbers in the names of fictitious people or relatives. Members also utilize numerous vehicles, and exchange vehicles at irregular intervals, with said vehicles being registered to relatives, fictitious companies, or in the names of invented individuals. I also have experience recognizing members of drug trafficking organizations engaging in driving maneuvers that are designed to assist criminals in the possible identification of law enforcement personnel who are engaging in surveillance operations. I also know drug traffickers use multiple residences in an effort to thwart law enforcement by separating the fruits of the crimes, to different locations. I know it is common for drug traffickers to use apartments, in order to blend in with multiple other residences, making it difficult for law enforcement to locate their location. All of these activities are done in the hope that criminal activities will be disguised.

5.      I have conducted numerous analyses of billing and toll records for telephones used by drug traffickers. I know drug trafficking is often furthered by using multiple cellular phones, multiple insulated contacts, and pre-paid cellular phones, which is also known as

compartmentalization. The use of the telephones in this manner is designed to help avoid detection by law enforcement.

6.      I know based upon training and experience that drug trafficking and money laundering organizations routinely use a number of other operational techniques, designed and implemented to achieve two goals: first, the successful distribution of controlled substances and the subsequent collection of the proceeds of that illegal activity; and second, the minimization of the exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

7.      I have participated in multiple drug cases, some of which have been Title III investigations, involving drug trafficking activities and have become familiar with the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the source and nature of the profits from their illegal drug dealings.

8.      I also know from training and experience that drug traffickers periodically change, or "drop," their telephones and/or telephone numbers in an attempt to avoid law enforcement interception of their conversations. Moreover, it is my experience that narcotics distributors purposefully use multiple communication devices (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit conduct, in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to thwart law enforcement interception of communications.

9.      This Affidavit is based on my observation and those of other officers.  This Affidavit does not contain every piece of information known to me and other investigators, but

3

rather only information sufficient to establish probable cause to support the requested warrant.

## PROBABLE CAUSE

10.      On December 3rd, 2024, I met with a Grafton Prison Investigator regarding a package seized with suspected narcotics. The Investigator provided me with three separate items for which the Grafton Prison's K-9 officer provided a positive alert to the presence of narcotics. The items, a 2019 GRE Handbook, Hillbilly Elegy, and a separate piece of paper, were observed with discoloration. Based on my training and experience, this discoloration was from the presence of narcotics which were sprayed onto the items. This method of concealment is known by investigators as a means to smuggle narcotics into prisons and jails.

### PRISON PHONE CALL BETWEEN INMATE RIVERA AND **SIEBERT**

11.      On November 25, 2024, at approximately 3:27 p.m., Inmate RIVERA contacted **SIEBERT** on **(419) 705-4095**. **SIEBERT** was identified and confirmed by investigators through multiple means, including **SIEBERT** utilizing his name in the GTL system[1], **SIEBERT** identifying himself in prison messages and phone calls to multiple inmates, and facility investigators who had prior dealings with **SIEBERT** verifying **SIEBERT** through voice identification of listening to prison phone calls. **SIEBERT** explained to RIVERA that packages were sent and provided the below details on the shipment:

> **SIEBERT**: "We drove fuckin like 45 minutes last night to do that shit."
> RIVERA: "Oh, 45 minutes to, oh shit."
> **SIEBERT**: "Yeah, it's all done."
> RIVERA: "Okay, hell yeah. So, Tuesday you think, next week?"
> **SIEBERT**: "I don't know. I used fucking the last on my

---

[1] Any communications made on the GTL system is recorded and informs both the inmate and participant, all conversations are, "subject to monitoring and recording."

4

welding wire so I don't know how good that shit is going to hold together, we'll see. It should be alright, better than nothing."

Later in the conversation:

RIVERA: "You said you got all of it on the Amazon thing?"
**SIEBERT**: Yeah, so you got 10, but they're smaller, but there's 10. I would say about 2/3 of the first one."

Based on my training and experience, I believe the above conversation is in reference to a package sent to RIVERA at Grafton Correctional Facility. SIEBERT telling RIVERA that he drove 45 minutes indicates to me that SIEBERT drove 45 minutes from his residence to send the package in an effort to thwart law enforcement from finding available video footage at his nearest post office. When RIVERA asked if SIEBERT "got all of it on the Amazon thing," RIVERA was referencing a technique used to smuggle narcotics into a prison facility. In my training and experience, "The Amazon Technique" is when an individual who is not incarcerated orders books from legitimate stores such as Barnes and Noble or Amazon. Inmates know they can only receive books from pre-authorized vendors, and without these receipts the books will not make it into the facility. Following the order the receipt will be printed of the purchase and the order will be cancelled. The shipper of the package will take the books purchased on the receipt and soak the pages of the books in different narcotics. The shipper will repackage the books, take the books to a post office with a shipping label attempting to make the package appear as it was ordered from Amazon or Barnes and Noble.

12.      On November 27, 2024, **SIEBERT** sent RIVERA a message (through the inmate's version of e-mail) telling him that the package was delivered. RIVERA replied verifying the package had arrived at the facility and **SIEBERT** confirmed. **SIEBERT** then told RIVERA to check with "Dude" to see if the package showed up on his tablet.

13.     On December 3rd, 2024, at approximately 1:48 p.m., RIVERA confirmed with

**SIEBERT** that the book "Hillbilly Elegy" was sprayed with substance on the last pages, as

reflected below:

> RIVERA: "Is it Hillbilly?"
> **SIEBERT**: "I don't know what you're talking about."
> **SIEBERT**: "Oh, yeah, yeah, yeah, That's the book, the book I'm reading. Fucking romance novel."
> RIVERA : "So, when you get a chance, you know what I need to know right?"
> **SIEBERT**: "The last lap."

Based on my training and experience, the content of the communications confirms **SIEBERT**

was informing RIVERA that the narcotics were in the last part of the book.

14.     At 2:29 p.m., during a second conversation, **SIEBERT** confirmed that

the substance was on the last 10 pages of the book:

> RIVERA: "Which one?"
> **SIEBERT**: "The last 10."
> RIVERA: "The last one?"
> **SIEBERT**: "The last 10."
> RIVERA: "Of the whole book?"
> **SIEBERT**: "Yes."

In my training and experience, this conversation confirms the pages which had been soaked in

narcotics.

## NARCOTICS TESTING RESULTS

15.     On December 3rd, 2024, a colleague and I seized the books from the prison

investigators and took the books to the Cuyahoga County Regional Forensic Science Laboratory

(hereinafter, "CCRFSL") for analysis. On December 13, 2024, I received a report from CCRFSL

detailing that the books tested positive for "5- Fluoro-ADB" and "MDMB-4en-PINACA." Both

of these narcotics are Schedule I controlled substances.

<u>CONVERSATION BETWEEN SIEBERT AND RIVERA</u>

16. On December 15, 2024, through December 16, 2024, **SIEBERT** AND RIVERA had the below conversation:

> **SIEBERT**: Why did it not accept?
> RIVERA: Really? I'm saying I'll have what I need for my food boxes soon
> **SIEBERT**: What the fuck is that lol Slammed down be back out 2mo or wed.
> RIVERA: Yo I'm gonna shoot you that money for my food box real soon. I just need the C. Hey I just need to know how I'm supposed to get this to you?? Gotta lmk. I've got 8 blue strips.

17. **SIEBERT** then sent a message containing the CashApp Handle of "$MMKP610108", which comes back to a "Jeremy Good." This is the account that **SIEBERT** wanted RIVERA to send the money. **SIEBERT** told RIVERA he has been busy and would be able to send a package tomorrow or Wednesday.

<u>SEIZURE OF PACKAGE SENT BY SEIBERT ON DECEMBER 30,</u>

<u>2024</u>

18. On December 30, 2024, a fellow TFO and I met with prison investigators in reference to an additional book sent by **SIEBERT** that was seized. The package contained a book being sent to Inmate Kristopher Scott. This package was linked by Prison Investigators to **SIEBERT** by prison recorded phone messages and recorded calls. On the book, "Corrupting the Innocent," it was clearly visible that the last pages of the book had been soaked in suspected narcotics. On January 10, 2025, I received the results from the CCRFSL. The seized book tested positive for 5-Fluoro-ADB, a Schedule I controlled substance.

19. On December 29, 2024, SIEBERT sent inmate Layne WILLIAMS, who is currently incarcerated at Allen/Oakwood Correctional Institution, a message through the GTL system stating, "Bunky[2] what u doin? U know the cards ur ppl were sendin? I got the books on

---

[2] Records show SIEBERT and WILLIAMS were confined in the same housing unit at Richland

7

deck. Let's get some bread nigga. I still owe u 50 for tht face too." Based on my training and experience, SIEBERT is offering to send Williams currently available drug-soaked books that could be sold for profit.

20. Later on December 29, 2024, SIEBERT sent a GTL message to Inmate Michael GUERIN, who is incarcerated at the London Correctional Institute, stating, "Im sure he asked that to shoot some bread[3] through but that nigga just paid for everyones xmas. U got sum1 in there that wants a book? So, we can make some bread nigga." In my training and experience, SIEBERT is further attempting to sell books soaked with narcotics and informing Guerin that SIEBERT can send the book to someone inside the facility to make some money.

21. On January 10, 2025, I located a recorded prison phone call of **SIEBERT** to RIVERA on **(419) 705-4095** stating he had "received the payment" and that it was, "100 percent good" and "I'm goingto get it done quick." To date, a package has not been mailed. Based on my training and experience, I believe **SIEBERT** is verifying he received payment, will spray the narcotics and send a book.

22. Starting around January 29, 2025, SIEBERT discussed with RIVERA that SIEBERT was putting together a "wire crimper" that he had "completely engineer[ed] . . . from scratch."  Doing it this way avoided SIEBERT having to buy one for "$1500."  SIEBERT also sent RIVERA pictures of gears that he was making (presumably with a 3D printer) and explained that he had "6 gears done."  SIEBERT stated, "Its gonna be dope tho.  Can use it over and over and over."  In my training and experience and knowing the facts of the case, I believe that the "wire crimper" referenced by SIEBERT is used to bind books after he has soaked pages with narcotics.

---

Correctional Institution. While they were confined in the same unit, there is no evidence they shared the same bunk. Living in the same housing area would allow them to interaction on a daily basis.

[3] The comment "bread" references money and SIEBERT and GUERIN are in discussion how to make money utilizing books soaked in narcotics.

23.     A text message sent from SIEBERT to RIVERA on February 1, 2025, at approximately 5:32 p.m. stated," If u dont wanna wait for this 2 be done right I can just try it. Its ur $. Up to you. Im doing the big base piece thats gonna take about 18 hours and I got one more after that and a couple side pieces. Im gonna recommend u wait till its done right. But if u make the call I'll just do it some different way that at least looks good. Up 2 u."

24.     On February 2, 2025, at 8:36 p.m., RIVERA wrote to SIEBERT, "Whats the time frame?  I'm not rushing you bro at all I just would like to know?  So I can manage my food better?"  In my training and experience and my knowledge of the interactions in this case, RIVERA's reference to "food" means drugs.  The next morning, SIEBERT responded "Day or two then."  In my training and experience, I believe SIEBERT was telling RIVERA he will be ready to deliver drugs in a day or two, likely due to the process of spraying drugs onto paper for delivery.

25.     On February 3rd, 2025, at approximately 1:51 a.m., SIEBERT told RIVERA, "A day or two then" following an inquiry from RIVERA. I believe, based on my training and experience, that SIEBERT was telling RIVERA when the narcotics would be shipped.

26.     On February 6, 2025, DEA agents executed a search warrant authorized by Magistrate Judge Darrell A. Clay, Northern District of Ohio, at 2714 River Road, Maumee, Ohio 43537. This residence had previously been identified by agents as the location where SIEBERT was currently living based on pings and observations. At approximately 2:31 p.m., agents observed SIEBERT leave the residence in his vehicle. A short time later, Ohio State Highway Patrol Troopers initiated a traffic stop, detaining SIEBERT.

27.     At approximately 2:35 p.m., agents made entry into 2714 River Road, Maumee, Ohio, the identified residence in the search warrant previously mentioned. After the residence was secured, agents conducted a search of the residence. During a search of the residence, the following items were located:

- A paperback book which had been soaked in suspected narcotics;

- A Bersa Thunder .380, SN: C05056, loaded with a round in the chamber;

- Several bags containing suspected controlled substances in both pill and powder form;

- The suspected binding machine; and

- Mailing labels for Amazon packages.

28.    The firearm, suspected fentanyl pills, cocaine and Isotonitazene were all located within SIEBERT's bedroom. Within the bedroom Agents located clothing belonging to SIEBERT, mail with SIEBERTs name, documents from State Prison with SIEBERT's name, and letters written by SIEBERT while in prison.

29.    All of the drugs were transported to the Cuyahoga County Regional Forensic Science Laboratory for conclusive testing on February 7. 2025 and results are pending.

_____

## **CONCLUSION**

30.     Based on the facts set forth in this affidavit, I submit there is probable cause to

believe that on or about November 27, 2024, in the Northern District of Ohio, Austin SIEBERT

committed a violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C),

distribution of a controlled substance. Affiant, therefore, requests that this Court issue a criminal

complaint and arrest warrant for Austin SIEBERT.

Adam W. Anderson
Task Force Officer
Drug Enforcement Administration

This affidavit was sworn to by the
affiant by telephone after a PDF was
transmitted by email, per Federal
Rule of Criminal Procedure 4.1

JONATHAN D. GREENBERG                    02-07-2025
UNITED STATES MAGISTRATE JUDGE

